The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Thank you, please be seated. Welcome, we are happy to have you with us today. We will hear argument first in number 22-4063, United States v. Critchfield. Good morning, I'm Richard Walker, may it please the Court, I represent Mr. Critchfield, may I pleasure to be here, especially after a few years of shutdown. I represent Daniel Critchfield, Daniel Critchfield is a gentleman from Bridgeport, West Virginia, lifelong resident of Bridgeport, West Virginia. He was seized without reasonable suspicion in February of 2016. When we got to the District Court, I filed a motion to suppress based on the lack of reasonable suspicion. The District Court denied that motion to suppress, and of course, I claim error. I appealed only on the issue of a bad stop, a Fourth Amendment violation, and I'm here today just to tell the Court a few things about my perspective on the case. Really, I have two points to make. One, the factors that the District Court relied upon in order to find reasonable suspicion are inadequate. But the five factors, that's not the end of the story. There are other factors that are included as significant in other cases, published cases issued by this Court, that have been overlooked. Those other factors, I'll list them, and they're not complicated, nothing about this case is complicated. It is a different case, it's not similar to Massenburg, or Black, or DiGiovanni, or Miller, recent case, or Drakeford, it's not similar to any of those cases, this case is different. But there are factors that were overlooked, and I would like the Court to consider these factors. Mr. Critchfield was stopped at 8 a.m., 8 a.m., and now, of course, what we see in the published cases from this Court, typically, to support reasonable suspicion, midnight, 2 in the morning, in some dark parking lot, not at all. This was rush hour, in a small town, in a residential neighborhood. Can you reasonably say that this case is different because at least one of the faults is that there's theft? And so, thinking about theft as people are leaving for work doesn't seem like a crazy idea. I mean, if the alleged crime, or the suspected crime, wasn't stealing from somebody's house, alright, I get you, but it seems like to me 8 a.m. doesn't cut one way or the other. If you're trying to steal from somebody's house, it seems like, from what little I know of this, the morning time is actually a common time, because people are gone, they're not there, right? That doesn't seem like a crazy time. Daytime is a good time to steal, and we see that a lot with street crimes and residential burglaries because people are usually out of their home, going to work, you know, up out of the house. Counsel, can I stop? Is there anything in the record about this? Like, did a police officer testify that 8 a.m. is a time when people are committing burglaries in the same room? No, absolutely not. What's more,  I'm not, again, it was sort of a speculative, it was very speculative. I just was responding to your point, it's like 8 a.m. cuts the other way. I mean, my point is, I don't know which way it cuts, but your point is, oh, this is 8 a.m., so we ought to think that it's not likely that there's a crime. My point is, we don't know one way or the other. The time doesn't matter here, because it doesn't inherently cut in favor or inherently cut against the allegations that we have here. I think that's an excellent point, but the cases support that something occurring during the daytime is not suspicious. So, for example, in Drakeford, which is a 2021 case, I cited it as supplemental authority. I apologize for not having it in the brief. In Drakeford's case, Drakeford was at this car stereo warehouse in broad daylight, in the middle of the day. And while I agree, sometimes times are not very telling. In Drakeford, Judge Thacker indicated specifically, something occurring in broad daylight is not suspicious. But specific to a drug transaction in front of a video camera in an open parking lot during the daytime. All right, I get that. It just doesn't seem like that translates to this case, where the suspected activity is robbery. I sort of agree with Judge Harris. There's nothing in the record here that suggests to us, pro or negative, that robberies happen more or less at 8 a.m. The court in Drakeford concluded that drug transactions happen less during the daytime, perhaps. I don't think it exactly says that, but it might suggest something like that. But we just don't have that here, that we have a different suspected crime, and whether it's more or less likely to happen at 8 a.m. just isn't part of what we have. I agree. Gerhardt couldn't articulate, Inspector Gerhardt, the complaining witness in this case. He couldn't articulate what the crime was. He couldn't say there had been robberies in the neighborhood. He didn't say he thought there was a burglary because he was in Critchfield on the property of a vacant home. Okay, but go back to the time, right? So you started off, like, it's your argument. I'm happy for you to talk about anything you want to, but you start off by saying the time is really important, right? This is 8 a.m., not at night. And what I'm trying to understand is why in the world that matters, given the record that we have. It matters because Critchfield could have been walking to work at 8 a.m. like everyone else, just like Gerhardt. Gerhardt got into his vehicle. This is very normal. He could have done a lot of things. He could have been walking to work at midnight, too, because people work at night. I guess what I'm trying to understand is why 8 a.m. matters. That's when people are out and about. That's when people go to work. That's when people drop their kids off at school. That's when people go volunteer. That's when people get up to exercise. I mean, that is the time when people are walking and are about and are doing things in the little town. Bridgeport is sort of like a small town. It's like a mid-sized town. It's a nice little town. It's not suspicious for someone to walk on the streets of Bridgeport, West Virginia, or any other town in West Virginia. Wheeling, Charleston, Martinsburg, Bridgeport, Clarksburg. Counsel, can I ask you a question? You talked about Inspector Gerhardt, and I have a question. You say in your brief that the district court put far too much weight on Gerhardt's professional experience and judgment. What is the right amount of weight to give that, in your view? Does it affect this case that the tip didn't come from just your average citizen, but from a postal inspector? It certainly is favorable to the government that the informant in this case was known and reliable. However, if you compare Gerhardt to the other investigators in other cases, for example, let's take the McCoy case. McCoy was a case from Virginia. There was a drug in a parking lot. In McCoy, the investigating officer made some observations about a vehicle moving from one parking lot to another parking lot. In this case, I did cite. In McCoy, the investigating officer was a drug agent. He was familiar with drug transactions happening in different parking lots in Loudoun County. In McCoy, the investigator had actually investigated a drug transaction in the same parking lot. Let me try to rephrase my question. Can I just try to ask the question in a different way? He's known, he's reliable, so the inspector should credit the facts that he gives them. When he says, I saw this, the police officers are fully entitled to credit that as true. Are they entitled to? Should we also be thinking about Gerhardt's kind of bottom line judgment call? Looking at these facts, I find it suspicious. Do we give any weight to that? No, he doesn't get extra credit because he is a federal employee, because he's a federal inspector, because he lacked, unlike the investigator from McCoy, he lacked the specialized knowledge. He lacked experience investigating street crimes in Bridgeport, West Virginia. So he is reliable. So your answer to that is, even though he is a federal law enforcement officer, he gets no deference. I mean, all right, I agree if he's a DEA agent and it's a drug crime, he gets, you know, a significant amount of deference, right? But, you know, your position is he gets no respect as a result of being a federal law enforcement officer? He gets all the respect in the world, but he's not an expert. So if you look at the officer in Miller's case, Theresa Miller's case. You don't have to be an expert, but what's in the evidence? What did he testify about? He testified. What's his background? Does he have experience doing this sort of thing? Well, the record's unclear, but what is true, and I have to acknowledge this fact, he was a police officer in Wheeling, West Virginia, which another city, small city in West Virginia, for five years, ten years prior to this incident. So he's trained as a... So that's it, there's nothing about as a postal inspector, ISS... No, no, he's not. He's never investigated robberies, burglaries, street robberies. He has no background in generalized investigation, because he was a police officer for five years. But again, if you look at the investigator in Theresa Miller's case, that, again, was someone very experienced in drug cases, who had been working in a specific area, was very familiar with this drug corridor. Gerhardt had none of that background, and that was overlooked by the district court. The district court, with all due respect, fine jurist, but the district court placed far too much emphasis on Gerhardt's experience, when, unlike the investigator in McCoy, unlike the investigator in Miller, he had absolutely no relevant experience that's in the record that could have given him sort of a plus next to his testimony, or extra credit. He was essentially a civilian living in that neighborhood, and again, you know, let's say that Gerhardt gets a little bit of extra credit, extra deference, because of his law enforcement background, and he's a fine law enforcement officer. What would the deference be to? I don't recall that he really testified to any sort of expertise. There was no point in his testimony where he said, and I knew this because I have been a police officer, and in my experience... That's exactly my point. What he observed, and what he explained to officers Hartley and Lemley, was very generalized. It was as generalized as someone's suspicion. I don't think it was that generalized. It's that, I mean, he testified to many specific things. It's just that everything he testified to, I would know too, like if someone has their hoodie down around their crotch, it's because they have something heavy in their hoodie. Right, like I just didn't catch that. I don't want to push you on this. I'm just trying to figure it. When you say he gets some extra credit, extra credit may be, you said even assuming, what is it that we would give the extra credit to? Just his bottom line assessment, like this looks suspicious. That's all you could give him extra credit for, because he didn't connect his training and his experience to any of his observations. He didn't relate anything that he did or saw to anything that he had specific experience doing. So he really doesn't, while everything he said was truthful, and while everything he said could have been relied upon by Officers Hartley and Lemley, none of it was specialized, none of it warranted by the district court the deference that he was given. So I want to move on, if it's all right with your honors, to discuss the facts that were considered. And those were some of the factors that I think just were not appropriately recognized by the district court at the time we talked about all that. But the factors, if you look at the factors that were considered, so Critchfield's out of place. That was what really was the beginning point for Inspector Gerhart. You know, if you look at the Black case from North Carolina, when Black was stopped by the investigators, and there were two or three other, maybe four African American men there in a semicircle, Black gave his ID to the investigator. And the government relied on the fact that Black was not from that area. So the that makes someone suspicious. The fact that Daniel Critchfield wasn't known to Gerhart is totally irrelevant. It should not support a reasonable suspicion analysis whatsoever, in my opinion. Now Gerhart, you don't have to check in, I don't want to be sort of sarcastic, you know, Gerhart's not the mayor of that neighborhood. He's not the block warden. Critchfield's a lifelong member of Bridgeport, West Virginia. And he's a resident, just like Gerhart is. The fact that Critchfield was unknown to Gerhart is totally insignificant. So I think that's... Is there anything in the record about this particular neighborhood? Was Critchfield from this neighborhood? No. And... It's not in the record, but he wasn't. Right. I don't want to... If it's not in the record, I'm not looking for evidence. There's no evidence that he was. There's no evidence that he was a lifelong resident of Bridgeport. Well, yeah, it's in the pre-sentence report. But it wasn't something that was necessarily considered. But his address was known. I don't want to say anything more about that, but the fact that someone's sort of unknown, I mean, you know, it's a wide world. I think your point has to do with all the circumstances, right? We don't look at these in isolation. And if there's someone in a, you know, gated community who, you know, steps out from an alley and no one, you know, you don't recognize them, that might have different weight, right, than in a neighborhood that's not blocked off from a commercial area. So when you say it has no weight, or it doesn't matter, or it's irrelevant, we're not supposed to pick these if we're assessing it, looking at all the circumstances. It matters less in one case than perhaps in another. Absolutely. If it was a very small community, gated community, so maybe a retirement community or something like that, where it's just a limited number of homes. My community has 300 homes. We've always had 300 homes. What's in the record about this neighborhood? It's a public street, public road. There are maps in the record, is that right? Yeah, public street, public road, residential, right adjacent to some businesses, just an ordinary residential neighborhood near some businesses where anyone could walk. No restriction. Pritchfield looked caught. He looked caught. He had a look. He locked eyes with Gerhardt. Can I ask you a question about the look? On the stand, Officer Lemley says, forget the look. It wasn't about the look. Is the look in front of us, given that Lemley sort of disclaims? I couldn't tell whether he was saying, I didn't even know about any look, or I absolutely didn't consider the look, but he does say, forget the look. The look is in front of us because Inspector Gerhardt testified he told Chief Hartley about the look. So that's the information. Then what do we do with what Lemley says? Lemley may not have been privy to all the information received. He said he heard everything. He's the only one who testifies. Does the other officer testify? Well, we just have different testimony. Testimony from Gerhardt where he said that he did communicate the look. Testimony from Lemley who said, yeah, he didn't hear that. He didn't say that. No, it wasn't that he was looking at Inspector Gerhardt in a way that was strange. He said that the fact that he had on the hoodie in the area he was coming out of, he looked at a place he had. Yeah, but the district court addressed the look. I understand that, but I'm wondering whether that was error given that the only officer who testifies says, no, forget the look. It could be. It could be, but I'm addressing it. If Gerhardt says he told them, the court has to value those. Maybe those two are in conflict. The district court found that the look was before him and the subjective views of the officer that that's not what he considered is not what we look at. When he says that's not what I consider, forget the look. His subjective views aren't what control. It's whether an objective officer, given all the information that was provided, would have found reasonable suspicion. Right. It's an objective test, not Lemley's subjective. That's true, but I understand where Judge Harris is coming from here in that it's possible Lemley didn't even have that information and we can't assess. But the district court found that he did, right? I mean, that's what the district court did. I mean, you know. It could have been an error. It could have been an error. It could have been an error. I'm just addressing it because it's out there. I'm just confused. It's not like the district court said, oh, we have competing testimony on this. I'm just confused about Officer Lemley's testimony and what we should do with it. Lemley says he didn't have that information. Lemley doesn't corroborate the look. He doesn't corroborate that he was told there was this look. But even if there was a look in Massenburg, just right across the river, in Massenburg, the government relied upon to argue in favor of reasonable suspicion. The government argued that Massenburg, you know, he wouldn't make eye contact. Counselor, I'm so sorry. I lost track of time and I see that you are somewhat substantially over. So if you want to just wrap up and you have rebuttal time. I will. Thank you. Thank you, Judge. I'll just finish up about the look because I think it's significant. The look, you know, government can't have it both ways. Government can't argue in Massenburg that it's suspicious that Massenburg would not make eye contact with the investigating officer and here argue that it's suspicious that Pritchfield did make eye contact. The pocket, I think that speaks for itself. Pockets hold things. That shouldn't be a basis for reasonable suspicion. So I apologize for running a little bit long here. Thank you for considering these points and thank you for having me here today. Ms. Wagner. Thank you, Judge Harris. May it please the court. The United States is asking this court to affirm the district court's denial of Mr. Critchfield's motion to suppress because officers did have reasonable suspicion that criminal activity was afoot on the morning of February 25th, 2016 when they stopped Mr. Critchfield. So what criminal activity? Is it your position that they had reasonable suspicion that there was, you know, a theft break-in? Yes, that is our position. That was what when... And is that that a break-in had already happened or is about to happen? In your brief, you said both. I believe it was both. I think that... But when they stopped him, he wasn't in the neighborhood anymore, right? He was a pretty good distance from the neighborhood in a commercial area walking, he said, towards his home. So did they still have reasonable suspicion that he was about to commit a break-in then? I don't believe that his proceeding from Gearheart's neighborhood over to the other side of Route 50 dispelled reasonable suspicion because of all of the evasive behavior. So in the moment... Well, did they... My question is just, did they still have reasonable suspicion that he was about to commit a break-in or just that... Is it now only that he already had and that's all... That's their only potential criminal activity now is that he had already committed one? I believe that that is fair, Your Honor. I think Lemley's... Officer Lemley's testimony was that he believed, based on what Gearheart had told him, that the items in his... In the hoodie jacket or hoodie pocket could be things that were stolen. But couldn't the invasive behavior... I mean, I... I mean, couldn't the invasive behavior... I mean, he sort of has this, like, interaction that leads to this evasive behavior. And so maybe he's not imminent about to commit a burglary, but that he's walking, cutting a loop, he's going around. I mean, that's the sort of part of reasonable suspicion that we don't know is whether he's doing a walkabout to get away or whether he's, you know, in fact, walking home. Either of those are plausible stories, right? Well, I don't... Well, first of all, Gearheart didn't know, so we can't impute to him the knowledge. But what Gearheart knows is that here's this unfamiliar person in the alley next to a house that Mr. Gearheart knows the owner is away, staying with her sister. Mr. Gearheart is here on Fifth Street and when Mr. Critchfield comes out of the alley, instead of coming down towards, down past Gearheart, towards all of these businesses that line Route 50, Mr. Gearheart goes further into the neighborhood, which is a residential neighborhood. There are no businesses there. Route 50 demarcates one side of the neighborhood. So I don't believe that Gearheart... Gearheart certainly didn't know where he was going, but it would not have occurred to him that Mr., it should not have occurred to him that Mr. Critchfield was walking to work by the path that he took. He went further into the residential neighborhood, away from the businesses that line Route 50. So, but Judge Richardson, you're correct that this evasive and nervous behavior is certainly something that the district court, that the the question for us is whether the officers had reasonable suspicion when they stopped him, right? Not, not whether Gearheart had reasonable suspicion at an earlier time, right? So we have to look at when he stopped on Airport Road or Route 50 or whatever it is, that did the officers have reasonable suspicion of what crime at that time? I think that, that they, that they did and if I Gearheart communicated to them these seven or so observations that he was in the neighborhood, he was unfamiliar. He's coming out of that alleyway next to the empty house. He takes this route away from Gearheart. He is looking over his shoulder at Gearheart as he's walking. At this point, Gearheart's getting in his car. He's not following Mr. Critchfield. As he's at, as he's, when Gearheart sees Mr. Critchfield looking over his shoulder, that is when he decides to follow in the path that he had just gone. So Gearheart goes up Fifth Street and turns right onto Grand Avenue and when he turns right onto Grand Avenue, Mr. Critchfield is now doubling back in this very same direction he just came. So all of those factors, the, are communicated to the, looking over his shoulder and the doubling back and the look of being caught on his face. So would any one of those evasive or nervous behaviors in and of themselves have given rise to reasonable suspicion? I don't think so and that's not the argument that we're making. Can I ask you just a question about the evasive behavior? What, I mean, I, I, there are lots of cases about evasive behavior when you're confronted by the police. What's our case law like on evasive behavior if you're just confronted with some guy in the neighborhood who's staring at you? I, I don't, I, I was not able to find anything like this, but... It's a little bit different, right? Like... It is. The fact that you try to evade the police is one thing. Someone's staring at you and like you look back over your shoulder to figure out why is this guy staring at me? That seems somewhat different. Well, there is, Judge Harris, there is no evidence in the record that Gearhart was staring at Mr. Critchfield like he's, you know, just staring, standing there looking at him. The, the testimony from Gearhart is he saw him and they made eye contact. Gearhart, Critchfield goes this way, Gearhart goes this way, and as Gearhart's getting in... I guess I'm just asking you as someone who, and I know we shouldn't bring our own intuitions to bear, but as someone who has tried to evade people who look at me funny on the street, I'm just, I can't find any case law saying that we should view that as suspicious. I, I, I agree that, that I also could not find case law, but, but what I would sort of segue into is to respond to your question about really what does, uh, Gearhart's status as a law enforcement officer play in this case? I don't think it, it harms the government's case because law enforcement is, is owed some...  But it also is not necessary to the government's case. If, if, if Inspector Gearhart was simply Mr. Gearhart, a resident of this neighborhood, um, even someone that, that Lemley and Hartley don't know at all, he calls the authorities because he sees this person in his neighborhood. He gives a, um, very descriptive, detailed, um, assessment of what Mr. Critchfield is wearing down to the color of his sweatshirt, the logo on his sweatshirt, his ball cap, his facial hair, the weighted down pocket. He stays on the line, um, with officers. He tells the officers which direction Mr. Critchfield is going in, and then lo and behold, as, uh, Lemley and Hartley are proceeding in that direction from the police station, there is a person, um, meeting the Mr. Gearhart, the postal inspector. So I, I think it's, um, it, to, I, I don't know how much it really mattered. The, uh, district court's focus on, or I won't say, well, focus on Mr. Gearhart's status as a law enforcement officer was mostly in the context of why Hartley and Lemley knew Gearhart and knew him to be a credible, um, relayer of information. Counsel, I guess I, um, trying to think how to phrase this. My concern about this case is that there's not much in the record, um, and I do wonder whether that's because, you know, the government, I don't mean to fault the government. Below, before the magistrate and the district court, the government is mostly arguing that the stop occurred later and when there was clearly reasonable suspicion. And I just wonder whether that's why the record maybe is just a little bit underdeveloped about what was going on at the earlier time. And I guess what I was looking for and did not find was anything from Officer Lemley saying, like, there have been break-ins in the area. 8 a.m. is a time when people might commit break-ins. This is a high crime neighborhood. Or even, like, in my experience, when I hear there is a bulge, that tells me something. And they try to get that out of Officer Lemley, right? They say, you saw the bulge. What does that in this context in that situation tell you? He's like, you know, nothing. That he had something in his hoodie. And whether it was something that was taken from someone, I don't know. You know what it could have been. Like, there's, I'm looking for the officer who says, no, no, everyone understands. At 8 a.m. in this neighborhood, someone with the bulge in the hoodie, it's either a gun or it's maybe something he just stole. But there's nothing like that in the record. And so all we're left with is, you know, it's 8 a.m., he's not recognized by someone in his neighborhood, and he's got something heavy in his sweatshirt. And how is that enough? Well, Judge, I would say a couple of things. You're correct that we were focused on the moment of detention and believing that the moment of detention was when he pulls the firearm out and Lemley and Gearhart raise the firearm. So that is correct. But I don't think, and I certainly could have done a better job below developing that, but I don't think that we are, we're lacking in the record because we don't have one or two factors. We have he's unfamiliar in the neighborhood, putting aside the time of day, because that truly is a neutral factor, which does not necessarily add to reasonable suspicion, but it also does not dispel reasonable suspicion for the reasons that Judge Richardson just talked about. But you've got him in the neighborhood, specifically in this alley next to this house. You have the look of being caught, which is not a clearly erroneous finding by Judge Keeley. There's no countervailing evidence about the fact that Mr. Gearhart, to dispute Gearhart's testimony in that regard. In fact, the only even suggestion that that's not what happened is my colleague's proffer in a footnote in his written objections that Mr. Critchfield told him after the suppression hearing that he never saw Gearhart. But Mr. Critchfield testified in a related state court proceeding, not that he never saw Gearhart, that he may have seen Gearhart, but he didn't think he was in trouble or anything like that. What we also have... I'm sorry, what's the district court finding of that? I just want to know what you're... Well, I think her crediting Gearhart's testimony that he had the look of being caught. Okay. Which I perceive in... It's not clear to me if Mr. Critchfield is saying that it didn't happen and that the finding was clearly erroneous or that the judge, the district court attached legal significance to that fact, which she should not have done. But there's... Just so I'm understanding, your point is on page 16 of the district court's order 270 of the JA, that these are the things that were known. This is what the magistrate judge first found and the district court here is finding is that they were exiting an alley at an unusual time of the day, walking a neighborhood away from a vacant home, looking as if he had been caught, changing his route. We've talked about it being evasive behavior, but changing one's route, whether evasive or not, and then wearing a hooded sweatshirt with a weighted down front pocket. Those are the findings of fact that the district court found established probable cause. Yes, Judge, or reasonable suspicion. Reasonable suspicion, yes. Sorry. And so in order for this court to overturn that particular finding, it would have to have a firm and definite conviction that a mistake was made. But we've got Mr. Critchfield in a post-Miranda interview after his arrest saying, I used drugs that day and here's the reason why. Here's the story about the gun. He says, I'm leaving my mother-in-law's trailer. I'm taking the gun with me because there's a small child in the house. I just brought a brand new holster. I don't have a license to carry a concealed weapon. I just got in trouble for that not too long ago. But I didn't want to draw attention to myself because I would be a man with a gun in the neighborhood. So he puts it in his pocket knowing full well that he's not supposed to be doing this. These are his words to investigators. Now, none of that gets imputed to Gearhart, but when the district court looks at all the facts, she can credit Gearhart's testimony that he saw a look of being caught on his face because that's what he was worried about that morning. He was worried about drawing attention. He's worried about having this concealed weapon. And this whole time that reasonable suspicion is mounting, by the time Lemley and Hartley come up to him, and he tells investigators this, I was trying to get the clip back on my belt. And that's what I was doing when he's shielding himself from Hartley and Lemley to avoid getting in trouble for that. Can you talk a little bit, we started the conversation with your colleague talking about Officer Gearhart's sort of law enforcement experience and your colleague sort of conceded he'd been a police officer for five years. Can you talk just a little bit about, you know, he wants to suggest he's somebody who would have no idea, you know, he just plays with letters, right? Versus somebody who has some real world law enforcement experience. Well, I will say this. My colleague is correct that Mr. Gearhart's patrol type work is dated. But I think that Judge Harris, you are also correct when you say this doesn't take, this is not a uniquely law enforcement perspective here. You know, I think it's a common human experience to understand when someone has a look of getting caught on their face. I see that look on my 10-year-old's face at least once a week. So it's not, it doesn't take an expert to see that look and to understand what that look is. It doesn't take an expert police officer to, you know, to see someone taking these weird routes and then doubling back. If someone in the neighborhood without a law enforcement. So can you help me understand this? So I'm trying to figure out, addressing the question to others, is whether the officers had reasonable suspicion when they made the stop, right? And so it seems to me that there would be a difference if I was trying to put myself in an objective officer's shoes. If a highly reliable but non-law enforcement person, right? The mayor, right? Somebody that everybody knows is highly reliable. There's a priest, the local priest makes the call, right? So they're highly reliable, right? And they're known. And they made the call and give these facts including, you know, looking as if he was caught doing something wrong. And if the officer got that call from a law enforcement officer, who, you know, I don't, they may not know he used to be a patrol officer, but they know he's a law officer, has certain training, and has certain experiences, whatever they are. They don't know at the time what that is. There seems to be some additional value in it being a law enforcement officer who has had some training and experience in being a law enforcement officer. You seem to say that doesn't matter. The priest is just as good as the law enforcement officer. But from the objective officer's perspective, it seems to me to be a difference, that there's an added plus. Your colleague said there's a, you know, some plus that these are observations that aren't coming from a layperson, but are coming from someone who's trained to be a law enforcement officer. I agree that it is a plus to our case and that Lemley and Hartley, they relied on Gearhart's observations. My only point is, even if all they had was, you know, a neighbor, a concerned neighbor making this call, what were they to do? The Fourth Circuit is... No, I totally get your point. Your point, I take it, is even if it was the priest, like there's enough here. Fine. My point is, imagine the priest wasn't enough. Like, isn't this some plus that they're getting this information from someone who's a trained law enforcement officer? Yes, I think there's plenty of authority, both from the Supreme Court and this Court, that officers' experience and training is owed some deference. And so, which part of Gearhart's testimony would get that deference because he was relying on his training or experience, either as a postal inspector or from whatever it was 10 years ago when he was last a patrol officer? Because I couldn't find anything where he says, look, I knew this because I'm a law enforcement officer in my experience, in my expertise, etc. I think what Gearhart testified to was that, you know, he's been a cop for 15 or 16 years. I can't remember what exactly he said. And that he could just... He just knew... That fed into his suspicion. And I think the District Court, in the first paragraph of the order, says something to that effect. But I think, really, the deference that he was given by Lemley and Hartley was that they knew him to be credible. So... I have a question about the bulge, because we're not talking much about the bulge, even though Gearhart said that that was the most suspicious thing. You know, we have some old case law saying, like, a bulge, no, it's not significant unless you have the officer testifying that, in his experience, he could recognize it as a gun. In his expertise, it's on the ankle. That's where the gangs are carrying the drugs. What weight do you think we should give the bulge in the absence of any testimony like that? I think it deserves the... I think it deserves significant weight in the totality of the circumstances. This is mounting suspicion. And everything that we've talked about here has been pretty much chronological. But we have the court, 2004, where the bulging sweatshirt pocket was a permissible factor upon which the court could... the officers could base reasonable suspicion. And the facts in that case were probably the most similar of all of the cases that I've been able to find to this. There's a report of... I can't remember if it was a gunshot or a man with a gun, but there was a activity in a particular area. The officers go there. They see a person with... They see a person who, when the person sees the police, he reflexively touches his pocket, and he walks away from police. Police circle around, you know, and when they meet each other he stops. He's frozen. But the police have seen something heavy in his pocket, and he's pushing it down. So, you know, if this were just the heavy pocket, no, this is not reasonable suspicion. But this is heavy pocket plus evasive behavior and nervous behavior. We also have other circuit case law where bulges in the pocket are sufficient for a Terry Frisk, which is not our situation here, but there's also other circuit case law on where people carry... Any cases about, like, heavy pockets turning out to be a reasonable suspicion that those might be valuables stolen from a house as opposed to a gun? Because I actually think the question of whether there was reasonable suspicion that he was carrying a gun is probably maybe an even easier case for the government, but you can't use that under black. So we need to find reasonable suspicion that he was carrying burglary implements or valuables, right? Or, I guess, or a weapon that he used in the burglary. I believe that's fair, Judge. And the cases that I could find were out-of-circuit cases, but basically they held that where there's bulges... No, it's not bulges. It's carrying items, carrying items that could suggest when you've got a person... So it would be the same in this case if he were carrying a bag? Correct. Yes. Okay. And so there's other circuit cases where carrying of items where you've got a person suspected of burglary, that can... No bulge in the hoodie. He's just carrying a bag. Right. I think it's the same. It would carry the exact same weight. But doesn't it all then just kind of come down to he was coming out of an alley from behind the Italian restaurant next to a house that Gerhardt knew was vacant? I mean, if the assumption of what's in his bag, right, say it's a bag instead of a pocket, is all based on where he was. So at all of the suspicion goes back to the location then. Well, I think they're connected. And between those two observations are the observations of evasive behavior. But what we can't do is deconstruct each factor, divorce it from all of the other factors. Right. Totally. I'm just... This conversation seems to have highlighted that the bulge in the pocket or the carrying a bag or doesn't really... It's not independent, right? That that assumption is based entirely on the location where he was coming from. Yes, Your Honor. Okay. And I see I'm woefully over my time. Unless there are any additional questions from the court, we would ask that the district denial of the suppression motion be affirmed. Thank you. Mr. Walker, you have five minutes. Thank you very much. I'd just like to make up just a few points. As it relates to the bulge, our position is that the bulge is ambiguous. And I do agree entirely with Judge Rushing that the bulge could have some significance depending upon the context of whether it's connected to some other event or some location such as the vacant home. I just want to point out that there's really no nexus to the vacant home in this case. There's no evidence in the record that Mr. Critchfield had ever been on the property of the vacant home. There's no evidence in the record that Mr. Critchfield was sort of curiously observing or sometimes people would say casing the vacant home, looking in the backyard, looking in the windows. There's proximity. There's proximity to a vacant home. There's no evidence that Critchfield knew that the home was vacant. So as I say, the bulge is ambiguous. And the context in this case doesn't help us understand or give greater meaning to the bulge. That's my position, that's my opinion. I would like to just comment on some of the terms. I don't want to stand silent to this. The district court in those five factors on page 270 never used the word evasive. The district court in its five factors never used the term nervous. I disagree with those characterizations, obviously. Those are interpretations of the conduct. And as it should note, it's very important in this case to note that Inspector Gerhardt had an unmarked vehicle and he was not in uniform. So evading a police officer is only that if someone knows that someone is a police officer. So I think that's obviously important to note. I think it's pretty obvious based on the discussion up until this point. And I will make one last point. Judge Harris, you pointed this out. Obviously, the context matters in every one of these cases. I readily concede if this was a high crime area or if there had been a history of burglaries, robberies, et cetera, in this particular neighborhood, there would be reasonable suspicion. But that is obviously not present. It's not a fact that was ever raised by the government. And you witnessed the district court. And that's very, very significant. So based on all the circumstances and the fact that it was not a high crime area, we believe Mr. Critchfield suffered a bad Terry stop and there was no reasonable suspicion. His Fourth Amendment rights were violated and we're asking the court to reverse. Thank you. Thank you both very much. We're sorry we can't come down and greet you as would be our preference. But we very much
judges: Pamela A. Harris, Julius N. Richardson, Allison J. Rushing